E. JEFFREY GRUBE (Cal. State Bar No. 167324)  jeffgrube@paulhastings.com
RISHI N. SHARMA (Cal. State Bar No. 239034)  rishisharma@paulhastings.com
RYAN C. HESS (Cal. State Bar No. 263079)  ryanhess@paulhastings.com
PAUL, HASTINGS, JANOFSKY & WALKER LLP
55 Second Street, 24th Floor
San Francisco, California  94105-3441
Telephone: (415) 856-7000
Facsimile:  (415) 856-7100

Attorneys for Defendant
UNITED PARCEL SERVICE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEN LOPEZ,<br><br>        Plaintiff,<br><br>  vs.<br><br>UNITED PARCEL SERVICE, INC., and<br>DOES 1 through 25, inclusive,<br><br>        Defendants. | No. C-08-5396 SI<br><br>**UNITED PARCEL SERVICE, INC.'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT OR, IN THE ALTERNATIVE, PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:       February 26, 2010<br>Time:       9:00 a.m.<br>Courtroom: 10, 19th Floor<br>Judge:     Hon. Susan Illston |

1  TO PLAINTIFF BEN LOPEZ AND TO HIS ATTORNEYS OF RECORD, MARK C. PETERS, AND

2  THE LAW OFFICES OF DUCKWORTH • PETERS • LEBOWITZ LLP; AND JOHN A. FURUTANI,

3  AND THE LAW OFFICES OF FURUTANI & PETERS, LLP:

4       PLEASE TAKE NOTICE that on February 26, 2010, at 9:00 a.m., or as soon as the matter may

5  be heard, before the Honorable Susan Illston in Courtroom 10 of the United States District Court for the

6  Northern District of California, located at 450 Golden Gate Avenue, San Francisco, California 94102,

7  Defendant United Parcel Service, Inc. ("UPS") will and hereby does move the Court for summary

8  judgment or, in the alternative, partial summary judgment.

9       UPS brings this Motion on the grounds that no triable issue of material fact exists and UPS is

10 entitled to complete summary judgment on all of Plaintiff's causes of action because UPS properly

11 classified him as an exempt executive and administrative employee for all relevant periods of his

12 employment.  In the alternative, UPS is entitled to partial summary judgment as to each element of the

13 executive and administrative exemptions for which there is no triable issue of material fact; as to

14 Plaintiff's first cause of action for the time Plaintiff was an On Road Supervisor and On-Job Supervisor

15 because he was properly classified as exempt under the Motor Carrier Act; and as to the remaining

16 causes of action because the claims are prohibited as a matter of law, Plaintiff cannot prevail on those

17 claims, or because the claim is time-barred.

18      The Motion is based on Federal Rule of Civil Procedure; the concurrently filed Memorandum of

19 Points and Authorities; the Declarations of Rishi N. Sharma, Bruce Strombom, Tyson Allen, Paul

20 Bloom, Michael Britt, Keisha Lee Cavil, David Comer, Steven Conyers, Harold Copeman, Steven

21 Grossman, Susan Hill, Vivian Joshua, and Larry Zaleski; all papers and pleadings on file in the Court;

22 and such further evidence as may be presented at or before the hearing on this Motion.

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page(s)**

I.   INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 1

II.  UNDISPUTED FACTS ............................................................................................. 1

    A.   The Business And Structure Of UPS ........................................................ 1

    B.   Lopez's Employment History and Termination........................................ 2

    C.   As FTS, Lopez's Job Was To Think, Make Decisions, and Solve Problems, ........ 3

    D.   As Hub Supervisor, Lopez Managed A Defined Portion Of The Hub Operation......................................................................................................... 4

        1.   Lopez Made Decisions to Improve the Operation ..................................... 4

        2.   Lopez Was Responsible for Ensuring His Staff Performed Well .............. 5

        3.   Lopez Spent Most of His Time Supervising................................................ 6

    E.   As Preload Supervisor, Lopez Managed The Preload In The Eastshore Center ......................................................................................................... 6

        1.   Lopez Managed Work, Identified Problems, and Developed Solutions..................................................................................................... 7

        2.   Lopez Evaluated, Coached, Developed, and Disciplined His Employees .................................................................................................. 7

    F.   As An ORS, Lopez Managed Every Aspect Of UPS's Package Delivery Operations In The Hayward, Benicia, Napa, And Eastshore Centers.................... 8

        1.   Lopez Managed, Coached, and Disciplined Drivers, and Supervised Groups of Drivers Assigned to Service Specific and Consistent Geographical Areas..................................................................................... 8

        2.   Lopez Identified Problems and Determined Solutions ............................. 8

        3.   Lopez Was Primarily Engaged in Management Duties ............................. 9

    G.   For Several Months Lopez Worked as On-Job Supervisor on Special Assignment................................................................................................. 9

    H.   As Training and Retention Supervisor, Lopez Managed the Training and Retention Program for the Twilight and Night Sorts in the North Bay Facility ...................................................................................................... 10

    I.   UPS Compensated Lopez As A Manager ............................................. 11

III. UPS IS ENTITLED TO SUMMARY JUDGMENT ....................................... 11

    A.   As Hub Supervisor, Preload Supervisor, Training And Retention Supervisor, And ORS, Lopez Was Properly Classified As Exempt Under The Executive Exemption ....................................................................... 12

        1.   Lopez Managed a Recognized Subdivision and Supervised Many Employees ............................................................................................... 12

        2.   Lopez Had the Authority to Make Personnel Status Changes, and His Recommendations Were Given Particular Weight............................ 14

        3.   Lopez Exercised Discretion And Independent Judgment ....................... 15

## TABLE OF CONTENTS
### (continued)

Page(s)

    a.    Management Involves Discretion and Independent Judgment ...................................................................... 15

    b.    UPS's Policies Leave Room for Management ............................ 16

    4.    Lopez Was Primarily Engaged in Exempt Duties ..................................... 17

B.    Lopez Was Also Exempt Under The Administrative Exemption As Hub Supervisor, Preload Supervisor, Training And Retention Supervisor, and ORS ........................................................................................................................ 17

    1.    Lopez's Work Related to Management Policies and Business Operations ................................................................................... 18

    2.    Lopez Meets the Third Element of the Administrative Exemption ......... 18

C.    Lopez Was Exempt Under The Administrative Exemption As On-Job Supervisor ............................................................................................................ 19

    1.    Lopez Performed Work Related to General Business Operations and His Job Required the Exercise of Discretion and Independent Judgment ........................................................................... 19

    2.    Lopez Executed Special Tasks Under General Supervision .................... 19

    3.    Lopez Was Primarily Engaged in Exempt Duties ..................................... 20

IV.    THE MOTOR CARRIER ACT BARS LOPEZ'S OVERTIME CLAIMS ..................... 20

    A.    UPS Is A Motor Carrier ...................................................................................... 20

    B.    Lopez's Driving Activity Qualifies Him For The Exemption ............................ 21

    C.    Lopez Delivered Packages in Interstate Commerce ............................................ 22

V.    UPS IS ENTITLED TO PREVAIL ON LOPEZ'S REMAINING CLAIMS FOR SEPARATE AND INDEPENDENT REASONS EVEN IF THE COURT FINDS A TRIABLE ISSUE ON EXEMPTION ............................................................................. 22

    A.    Lopez Cannot Show He Was Denied Meal And Rest Periods ............................ 22

    B.    Lopez's Wage Statement Penalty Claim Is Barred ............................................ 23

    C.    Lopez Cannot Recover Waiting Time Penalties Because There Is a Good Faith Dispute Regarding Wages Allegedly Due to Him ...................................... 23

    D.    Lopez's Wage Claims Cannot Be Pled as Conversion ....................................... 23

    E.    Lopez Cannot Recover Civil Penalties ............................................................... 24

    F.    Punitive Damages Are Unavailable On Wage Claims ........................................ 24

    G.    Lopez Cannot State His Claims Under Section 17200 ........................................ 25

VI.    CONCLUSION ......................................................................................................... 25

# **TABLE OF AUTHORITIES**

Page(s)

CASES

*Anderson v. City of Cleveland*,
   90 F. Supp. 2d 906 (E.D. Tenn. 2000) ...................................................................19

*Anderson v. Timber Prods. Inspection, Inc.*,
   334 F. Supp. 2d 1258 (D. Or. 2004) ......................................................................21

*Arias v. Superior Court*,
   46 Cal. 4th 969 (2009) .............................................................................................24

*Baldwin v. Trailer Inns Inc.*,
   266 F.3d 1104 (9th Cir. 2001) ...........................................................................12, 15

*Barnhill v. Robert Saunders & Co.*,
   125 Cal. App. 3d 1 (1981) .......................................................................................23

*Bell v. Farmers Ins. Exch.*,
   87 Cal. App. 4th 805 (2001) .........................................................................15, 18, 19

*Bishop v. Petro-Chemical Transp., LLC*,
   582 F. Supp. 2d 1290 (E.D. Cal. 2008)...................................................................21

*Brewer v. Premier Golf Props.*,
   168 Cal. App. 4th 1243 (2008) ................................................................................24

*Caliber Bodyworks, Inc. v. Superior Court*,
   134 Cal. App. 4th 365 (2005) ..................................................................................24

*Cortez v. Purolator Air Filtration Prods. Co.*,
   23 Cal. 4th 163 (2000) .............................................................................................25

*Crooker v. Sexton Motors, Inc.*,
   469 F.2d 206 (1st Cir. 1972).....................................................................................21

*Davis v. Morris*,
   37 Cal. App. 2d 269 (1940) ......................................................................................23

*Donovan v. Burger King Corp.*,
   672 F.2d 221 (1st Cir. 1982).....................................................................................17

*Donovan v. Burger King Corp.*,
   675 F.2d 516 (2d Cir. 1982)......................................................................................16

*Hutson v. Rent-A-Center, Inc.*,
   209 F. Supp. 2d 1353 (M.D. Ga. 2001) ..................................................................21

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Joiner v. City of Macon*,
 647 F. Supp. 718 (M.D. Ga. 1986) ......................................................................12

*Kennedy v. Commonwealth Edison Co.*,
 410 F.3d 365 (7th Cir. 2005) ............................................................................16

*Korea Supply Co. v. Lockheed Martin Corp.*,
 29 Cal. 4th 1134 (2003) .....................................................................................25

*Lott v. Howard Wilson Chrysler-Plymouth, Inc.*,
 203 F.3d 326 (5th Cir. 2000) ......................................................................16, 18

*McAllister v. Transamerica Occidental Life Ins. Co.*,
 325 F.3d 997 (8th Cir. 2003) ............................................................................17

*McKell v Wash. Mut., Inc.*,
 142 Cal. App. 4th 1457 (2006) ........................................................................24

*Molina v. Sea Land Servs., Inc.*,
 2 F. Supp. 2d 185 (D.P.R. 1998) .......................................................................12

*Murphy v. Kenneth Cole Prods., Inc.*,
 40 Cal. 4th 1094 (2007) .....................................................................................25

*Perine v. ABF Freight Sys., Inc.*,
 457 F. Supp. 2d 1004 (C.D. Cal. 2006) .......................................................16, 18

*Piscione v. Ernst & Young, LLP*,
 171 F.3d 527 (7th Cir. 1999) ............................................................................16

*Pyramid Motor Freight Corp. v. Ispass*,
 330 U.S. 695 (1947) ...........................................................................................21

*Reich v. Am. Driver Serv.*,
 33 F.3d 1153 (9th Cir. 1994) ............................................................................21

*Reich v. John Alden Life Ins. Co.*,
 126 F.3d 1 (1st Cir. 1997) .................................................................................17

*Roe-Midgett v. CC Servs., Inc.*,
 512 F.3d 865 (7th Cir. 2008) ............................................................................17

*Ross v. U.S. Bank, N.A.*,
 542 F. Supp. 2d 1014 (N.D. Cal. 2008) (Illston, J.,) ........................................23

UPS'S MEMO. ISO SUMMARY JUDGMENT
U.S.D.C., N.D. Cal., No. C-08-5396-SI

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

*Watkins v. Ameripride Servs.*,
  375 F.3d 821 (9th Cir. 2004) ..................................................................................22

*West v. Anne Arundel County*,
  137 F.3d 752 (4th Cir. 1998) ..................................................................................12

*White v. Starbucks Corp.*,
  497 F. Supp. 2d 1080 (N.D. Cal. 2007) ..................................................................23

**STATUTES**

2000 Cal. Stat. ch. 876, § 7 ..........................................................................................22

49 U.S.C. § 13102(14) ..................................................................................................20

49 U.S.C. § 31132(1)(A) ..............................................................................................20

49 U.S.C. § 31502(b)(1) ...............................................................................................20

Cal. Bus. & Prof. Code §17200 ....................................................................................25

Cal. Bus. & Prof. Code § 17203 ...................................................................................25

Cal. Lab. Code § 203 .....................................................................................................23

Cal. Lab. Code § 226(a) ................................................................................................23

Cal. Lab. Code §§ 226(a), 226.7 ...................................................................................11

Cal. Lab. Code § 226(e) ................................................................................................23

Cal. Lab. Code §§ 510, 515 ...........................................................................................11

Cal. Lab. Code §§ 1182.11, 1182.12 .............................................................................12

Cal. Lab. Code § 2698 *et seq.* ......................................................................................24

Cal. Lab. Code § 2699.3 ................................................................................................24

California Labor Code section 225.5, 226.3, 558, and 1174 .........................................24

California Labor Code section 226.7 .............................................................................22

Fed. R. Civ. P. 56 ...........................................................................................................12

Wage Order 9-2001 § (3)(L)(1) .....................................................................................20

-v-

## **TABLE OF AUTHORITIES**

**Page(s)**

**OTHER AUTHORITIES**

8 Cal. Code Regs. § 13520................................................................................................23

29 C.F.R. § 541.102(b) (2002).........................................................................................16

29 C.F.R. §§ 541.102(b), 541.108 (2002)........................................................................17

29 C.F.R. § 541.104 (2002) ..............................................................................................12

29 C.F.R. § 541.106 (2002) ..............................................................................................14

29 C.F.R. § 541.205(a) (2002)....................................................................................18, 19

29 C.F.R. § 541.207(a) (2002)....................................................................................15, 20

29 C.F.R. § 782.2(a) (2002)..............................................................................................21

29 C.F.R. § 782.2(b)(3).....................................................................................................21

29 C.F.R. § 782.7(b)(1).....................................................................................................22

46 C.F.R. § 37902 (1981) .................................................................................................21

49 C.F.R. §§ 395.1-395.13................................................................................................20

46 Fed. Reg. § 37903 ........................................................................................................21

IWC Wage Order 9-2001...................................................................................................11

IWC Wage Order 9-2001 § (1)(A)(1).................................................................................12

IWC Wage Order 9-2001 § (1)(A)(1), (2) .........................................................................11

IWC Wage Order 9-2001 § (1)(A)(1)(e) .....................................................................15, 17

IWC Wage Order 9-2001 § 1(A) .......................................................................................22

IWC Wage Order 9-2001 § 1(A)(2)...................................................................................18

IWC Wage Order 9-2001 § 1(A)(2)(f)...............................................................................20

IWC Wage Order 9-2001 § 1(A)(1)(c)...............................................................................14

IWC Wage Order 9-2001 § 3(L)(1)...................................................................................20

LEGAL_US_W # 63634475.9

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.   INTRODUCTION AND SUMMARY OF ARGUMENT

As a Full Time Supervisor ("FTS") for Defendant United Parcel Service, Inc., Plaintiff Ben Lopez's job was to manage, motivate, train, discipline, and—when necessary in his judgment—terminate employees.  This was no easy task.  Each UPS employee is responsible for his or her respective link in the complex logistical chain that moves millions of packages every day, and Lopez managed his team through UPS's sophisticated business operation.  Lopez's job was challenging and required regular judgments and critical problem solving about staffing, training, scheduling, and the proper allocation of resources to achieve business success.  He worked hard, and UPS compensated him well with a handsome salary and annual stock awards and bonuses.

In this lawsuit, Lopez alleges that his job duties did not qualify him as exempt from California's overtime pay requirement and other obligations due only to non-exempt employees.  Accordingly, Lopez pled causes of action for unpaid overtime, failure to provide statutory breaks, failure to furnish properly itemized wage statements, conversion, failure to pay final wages timely, and unfair competition.  All his claims rest on his exempt status, and all lack merit because the undisputed material facts show that UPS at all relevant times properly classified Lopez as exempt under the executive, administrative, or Motor Carrier Act exemptions.  UPS is therefore entitled to judgment as a matter of law.

Alternatively, even apart from Lopez's own testimony and the undisputed facts that show him to be exempt, UPS is entitled to summary judgment on most of his claims for separate and independent reasons:  (1) UPS did not prevent Lopez from taking meal or rest periods; (2) UPS did not knowingly and intentionally furnish false wage statements or willfully fail to pay Lopez his final wages on termination; and (3) Lopez's claims for conversion, unfair competition, punitive damages, and civil penalties fail because California law prohibits these theories of relief.

## II.   UNDISPUTED FACTS

### A.   The Business And Structure Of UPS.

UPS is an international shipping company that provides motor vehicle transportation of letters and packages to and from various locations in the State of California, across the United States, and

UPS'S MEMO. ISO SUMMARY JUDGMENT
U.S.D.C., N.D. Cal., No. C-08-5396-SI

TABLE OF AUTHORITIES

Page(s)

throughout the world.  Tr. 81:20-82:3.  UPS is certified as a motor carrier by the U.S. Department of Transportation ("DOT").  Britt Decl. ¶ 8-9. [1]

Preloaders and Drivers report to work at a Package Center within a UPS facility.  Conyers Decl. ¶ 4, 6.  Preloaders load package cars (the familiar UPS brown trucks) in a systematic way, allowing easy and efficient package delivery.  *Id.* ¶ 4.  After package cars are loaded, Drivers make deliveries, pick up packages from customers, and then return to their Package Center.  Comer Decl. ¶ 5-6.  Packages then enter an operation called the Hub, where employees called Unloaders, Sorters, and Loaders unload packages, sort them by destination, and then load them for further movement through a hub-and-spoke system across UPS facilities until the packages reach their final destination.  *Id.* ¶ 8.

Preloaders report to Part Time Supervisors ("PTS"), who in turn report to a Preload Supervisor. Conyers Decl. ¶ 8.  Preload Supervisors have responsibility for the Preload operation in their assigned Package Centers.  *See id.* ¶ 12.  The Preload Supervisor reports to a Preload Manager.  *See id.* ¶ 3. Similarly, Unloaders, Sorters, and Loaders report to PTS's who report to a Hub Supervisor.  Comer Decl. ¶ 11.  The Hub Supervisor reports to a Hub Manager.  *See id.* ¶ 12.  Drivers, by contrast, report to an On Road Supervisor ("ORS"), who is responsible for a group of Drivers that services a specific portion of the geographic area serviced by the Package Center.  *Id.* ¶ 6.  The ORS reports to a Center Manager.  *Id.*

Other UPS functions provide administrative support to the package deliver operation.  Relevant here is UPS's Industrial Engineering Department ("IE"), which includes On-Job Supervisors who report to an IE Manager.  Copeman Decl. ¶ 4.  The Hub sometimes also includes an FTS called Training and Retention whose job is to train and evaluate new Hub employees, improve employee retention, and ensure health and safety compliance.  Joshua Decl. ¶ 6-7  Training and Retention Supervisors report to the Hub Manager who oversees the relevant portion of the operation.  *See id.* ¶ 3.

### B.   Lopez's Employment History and Termination.

Lopez following chart summarizes Lopez's relevant employment history as an FTS.

| Position | Dates | Facility | Operation/Center |
|---|---|---|---|
| Hub Supervisor | 3/5/01 – 4/30/03 | North Bay | Night Sort |

[1] UPS cites to the August 26 and 27, 2009, transcript of Lopez's deposition as "Tr. [page]:[line];" and declaration testimony as "[Last Name] Decl. ¶ ___."

TABLE OF AUTHORITIES

Page(s)

| Hub Supervisor | 5/1/03 – 5/12/04 | North Bay | Day Sort |
|---|---|---|---|
| On-Road Supervisor | 5/13/04 - 10/8/04 | Concord | Benicia Center |
| On-Road Supervisor | 10/9/04 – 12/31/04 | Napa | Napa Center |
| On-Job Supervisor | 1/1/05 – 7/31/05 | Various | Various |
| On-Road Supervisor | 8/1/05 – 12/31/05 | North Bay | East Shore Center |
| Hub Supervisor | 1/1/06 – 7/31/06 | North Bay | Day Sort |
| Preload Supervisor | 8/1/06 – 10/22/06 | North Bay | East Shore Center |
| Hub Supervisor | 10/23/06 – 1/31/08 | North Bay | Twilight Sort |
| Training & Retention | 2/1/08 – 6/1/08 | North Bay | Twilight & Night Sorts |
| On-Road Supervisor | 6/2/08 – 6/24/08 | Oakland | Hayward Center |

UPS terminated Lopez for falsifying a certification that he had a valid driver's license when he, in fact, did not. Tr. 6:22-7:1; 291:21-292:3.

### C.   As FTS, Lopez's Job Was To Think, Make Decisions, and Solve Problems,

What unites Lopez's FTS position is their focus on supervision and decisionmaking.   No written methods told Lopez how to accomplish this job as a Fulltime Supervisor. Tr. 206:5-14.  He reviewed "service results daily and present[ed] a plan of action for any areas not at or surpassing [their] goal," except as an OJS.  Tr. 66:4-14; 68:4-5; 70:5-22; Ex. 2.  To fix problems, he determined "what was hindering the progress of the production."  Tr. 180:2-11.  Fixing these problems was no easy task: conditions changed quickly at UPS and the "attitudes and the personalities of employees" varied from shift to shift.  Tr. 79:15-80:2.  Nor could Lopez resort to performing hourly tasks himself: he understood that the union contract prohibited him from performing the work his employees performed.  Tr. 406:1-4. To make the operations work better, Lopez had to actively manage his employees and their conflicts, and promote teamwork and cooperation.  Tr. 180:19-181:1; Tr. 73:8-13; 181:3-6.  Lopez developed capable people and ensured that his employees received quality training based on his observations.  Tr. 69:23-70:4; 122:22-123:13; 117:25-118:2; Ex. 2.

UPS'S MEMO. ISO SUMMARY JUDGMENT
U.S.D.C., N.D. Cal., No. C-08-5396-SI

**TABLE OF AUTHORITIES**

**Page(s)**

**D.** ~~As Hub Supervisor, Lopez Managed A Defined Portion Of The Hub Operation.~~

There are three shifts in UPS's North Bay Hub: the Day Sort, the Twilight Sort, and the Night Sort. Comer Decl. ¶ 9. Each Sort was further divided between the North Wall, where packages were loaded, the South Wall, where packages were also loaded, and the Primary, where packages were unloaded and sorted. Tr. 89:13-90:7; 94:19-23. One Hub Supervisor is responsible for each of these areas during each Sort. *Id.* The South and North Walls were further divided into belts based on the destination of packages working through the Hub. Tr. 86:15-87:24. Each belt was staffed by consistent groups of hourly employees and supervised by a single PTS, who in turn reports to a Hub Supervisor. Tr. 91:17-20; 86:15-87:24; 95:15-96:1; 96:13-17; Comer Decl. ¶ 10-11. UPS reports reflected this division of UPS employees onto belts. Tr. 375:24-376:10.

From March 5, 2001, to May 1, 2003, Lopez was Hub Supervisor in the North Bay Facility on the Night Sort where he supervised five PTS and their assigned areas on the South Wall. Tr. 11:5-9; 13:13-18; 91:21-92:6; 92:14-17; 210:12-18. Lopez then moved to the Day Sort where he remained until May 13, 2004. Tr. 15:3-11; 18:3-9; 53:4-19. During this time, he supervised seven PTS on the North Wall. Tr. 210:20-22; 96:18-22. Lopez again worked on the Day Sort from January 1, 2006, to July 31, 2006, and supervised seven PTS. *Id.*; Tr. 40:11-18; *See* 20:12-25. From October 23, 2006, to February 1, 2008, Lopez returned to the North Wall on the North Bay Facility's Twilight Sort where he again directly supervised seven PTS. Tr. 27:7-16; 28:6-8; 86:8-14; 92:7-13; 210:20-22. On each Sort, Lopez's PTS supervised approximately 45 to 60 hourly employees. Tr. 89:13-91:3; 92:14-22; 96:18-23.

**1.    Lopez Made Decisions to Improve the Operation.**

On a daily basis, Lopez worked to improve service results. Tr. 66:4-14; 68:4-5; 70:5-22; Exh. 2. Frequent volume fluctuations and the changing work environment forced Lopez to solve problems on the fly. *See* Tr. 82:4-6; 376:11-23. He had his own ideas about how to do that and created action plans to improve the efficiency of the operation. Tr. 360:4-6; 360:15-23; 367:25-368:5; 384:14-17. For example, Lopez created a four-step action plan to prevent packages from being left behind in the building after the feeder trucks departed. Tr. 446:4-447:14; Ex. 35. Lopez created the plan because he understood that "there was a problem and [he] was responsible for fixing it." *Id.*; *accord* Ex. 35 ("I am required to monitor the integrity of our commitments to service and made adjustments as needed.") His decisions

impacted the Hub on a day-to-day basis. ~~Based on his evaluation~~ during a sort, for example, Lopez could request that the Primary unload packages in a different order to make the volume flow better through the building.  Tr. 379:13-380:7; 501:5-502:17; Exh. 43.  Similarly, he could recommend that two half-full outbound trailers be consolidated into a single trailer to save UPS money.  Tr. 382:22-383:9.

Lopez also walked the floor during the operation, identifying problems, and correcting them.  Tr. 269:13-17; 269:21-25.  When problems arose in one area—say, a belt backup—Lopez moved hourly employees between functions, and worked with other Hub Supervisors to move employees between areas of the Hub.  Tr. 295:19-296:4; 296:13-297:25; 378:15-20.  If another Hub Supervisor asked Lopez to send employees, Lopez would consult with his own PTS to determine how the operation was running, and considering the anticipated volume, he might determine that he could send employees to assist; and if he did so, he chose the employees whom he judged best able to provide the help needed.  Tr. 419:9-420:13.  Lopez also analyzed volume projections to ensure adequate staffing.  Tr. 498:12-25.  Based on his evaluation of volume and staffing needs, Lopez could also recommended that employees work double shift or that employees be sent home early.  Tr. 378:3-14; 379:2-12.

### 2.    Lopez Was Responsible for Ensuring His Staff Performed Well.

All day, every day, Lopez trained his PTS in everything required to run a sort operation.  Tr. 120:6-121:21.  Lopez also ensured that all of his supervisors completed their daily tasks, and if they did not, he needed to find out why and correct the problem.  Tr. 449:22-450:25.  For example, in a write-up about one of Lopez's PTS's performance, he acknowledged:  "It is my responsibility to [e]nsure that all of my supervisors complete their entire daily task.  If a task is not completed I must find out why and correct it.  If it continues then I need to take corrective steps with my supervisor without instruction from my manager."  Tr. 449:20-450:25; Exh. 38.  Lopez held employees accountable when they consistently performed poorly by issuing warning letters, suspending them, and if necessary, recommending their termination.  Tr. 161:8-20; 184:2-185:17; 188:20-189:11.  Indeed, as Hub Supervisor, Lopez recommended more than ten employees for termination. Tr. 187:16-19.  For example, Lopez issued a working termination to Mike Marshall on the Twilight Sort.  Tr. 392:21-394:3; Ex 20.  Lopez also worked with superior employees.  Tr. 439:23-443:2; Ex 32.  His assessment was a necessary step in the promotion process.  *Id.*  Lopez's managers gave these recommendations regarding termination and

1   promotion particular weight.  Comer Decl. ¶ 14-16.  Based on his observations of his PTS, Lopez also

2   completed evaluations for his PTS.  Tr. 123:24-124:8; 177:22-178:13.

3        More generally, Lopez supervised his subordinate PTS and hourly employees, monitored and

4   evaluated their work performance, and trained them on ways to make improvement.  He used audits to

5   evaluate performance, and when those audits revealed problems, he worked with employees to solve

6   them.  Tr. 384:18-386:11.  If an employee was not following the methods correctly, Lopez could chose

7   to address the problem himself or instruct one of his PTS to address the issue.  Tr. 283:8-284:7.  Further,

8   all new hires in the Hub start their employment on probation; an employee who passes probation is

9   promoted to seniority status while an employee who does not pass probation is terminated.  Tr. 193:25-

10  195:2.  As a Hub Supervisor, Lopez was responsible for evaluating the performance of new hires and

11  then recommending their promotion to seniority status or termination to his managers.  Tr. 190:23-192:7;

12  195:24-196:18; 197:2-7.

13              **3.    Lopez Spent Most of His Time Supervising.**

14       As Hub Supervisor, Lopez spent 80% of his time on exempt tasks like attending management-

15  level meetings or conducting his own meetings with hourly employees or PTS (10%); assigning, moving,

16  or directing hourly employees or PTS, including handling staffing issues (10%); instructing, training,

17  coaching, evaluating, disciplining, or motivating subordinates (10%); supervising or directing workload,

18  package flow, and pick-ups and deliveries, including conducting audits (5%); preparing or handling

19  paperwork, including time card input and reviewing for errors (10%); analyzing reports and data (15%);

20  and other managerial tasks that required Lopez to use his own judgment and that typically could not be

21  handled by subordinates, including payroll issues (15%).  Tr. 102:12-105:6; Exh. 3; Comer Decl. ¶ 18.

22         **E.    As Preload Supervisor, Lopez Managed The Preload In The Eastshore Center.**

23       From August 9, 2006, to October 23, 2006, Lopez worked as Preload Supervisor in the Eastshore

24  Center at the North Bay Facility and supervised the entire preload operation for that Package Center.  Tr.

25  26:5-22; Cavil Decl. ¶ 5.  Lopez had sole responsibility for the Preload, was the only direct supervisor

26  for the five PTS who worked under him, and the second-level supervisor for the 40 hourly employees

27  who worked the Preload.  Tr. 167:14-23; 167:24-168:7.  Lopez had no time to perform hourly work.  Tr.

28  410:19-23; 412:5-7; 414:5-7.

LEGAL_US_W # 63634475.9

UPS'S MEMO. ISO SUMMARY JUDGMENT
U.S.D.C., N.D. Cal., No. C-08-5396-SI

TABLE OF AUTHORITIES

Page(s)

### 1.   Lopez Managed Work, Identified Problems, and Developed Solutions.

As a Preload Supervisor, Lopez performed job duties similar to those he did as Hub Supervisor. Tr. 387:14-18; 389:3-8.  Lopez was "responsible for planning, delegating, and reviewing the day to day area activities of the preload operation."  Tr. 468:2-15; Ex. 42.  He planned the work schedule daily by focusing on expected volume, staff levels, and department goals.  Tr. 474:13-476:1; Ex. 42.  He also reviewed and analyzed "work group processes to troubleshoot service inefficiencies, modify work plans [and] behaviors, and improve performance."  Tr. 476:2-25; Ex. 42.  Similarly, he reviewed an analyzed Industrial Engineering and Package Operations reports to resolve problems.  Tr. 478:4-479:2; Ex. 42.  He met with his PTS and hourly employees to discuss the daily plan.  Tr. 474:13-476:1; Ex. 42.  Lopez also dispatched late packages and worked with the on-road team to help determine and meet their dispatch needs.  Tr. 470:13-471:19; 474:13-476:1; Exh. 42.

During the operation, Lopez needed to be on his feet supervising his area of responsibility.  *See* Tr. 269:13-17.  Lopez ensured that packages flowed smoothly through the operation and that he held employees to the methods.  Tr. 387:24-388:12.  To help packages flow better, Lopez coordinated with the Feeder and Preload departments to facilitate unloading and sorting.  Tr. 474:13-476:1; Ex. 42.  When backups occurred, Lopez's job was to pinpoint the method that caused the backup and solve the problem. Tr. 388:13-16.  For example, Lopez could move employees around to solve a bottleneck.  Tr. 388:17-20.

### 2.   Lopez Evaluated, Coached, Developed, and Disciplined His Employees.

Supervising the Preload also gave Lopez responsibility for the performance of the subordinate employees assigned to him:  He trained employees.  Tr. 477:1-25; Ex. 42.  He conducted audits to ensure compliance with various regulations.  Tr. 473:9-17; Ex. 42.  And he inspected work during the Preload to ensure the employees were working consistent with UPS's expectations.  Tr. 470:13-471:19; Ex. 42. When employees did not perform, Lopez disciplined them.  For example, Lopez recommended that UPS terminate at least one of his PTS.  Tr. 187:16-19.  Likewise, Lopez had the authority to recommend promotion for strong performers.  Lopez also evaluated new employees for retention or termination:  Just as with the Hub, new Preload employees began their employment in a probationary status; to advance the Preload Supervisor needed to sign off on their training packet.  Tr. 287:8-288:1; 431:15-433:1; Ex. 28. New employees who did not advance were terminated.  *Id.*  Lopez filled out these training packages and

UPS'S MEMO. ISO SUMMARY JUDGMENT
U.S.D.C., N.D. Cal., No. C-08-5396-SI

his managers gave significant weight to his recommendations regarding seniority status.  Tr. 433:2-4;

Conyers Decl. ¶ 10-11.

**F.     As An ORS, Lopez Managed Every Aspect Of UPS's Package Delivery Operations
In The Hayward, Benicia, Napa, And Eastshore Centers.**

Lopez first worked as an ORS from May 13, 2004, to October 9, 2004, in the Benicia Center of

UPS's Concord Facility.  Tr. 18:3-18; 19:17-23.  Lopez then worked in the Napa Center as an ORS until

December 31, 2004.  Tr. 41:18-21; 42:3-4; 44:14-17; 125:6-10; 127:4-17; Allen Decl. ¶ 3. From August

1, 2005, to January 1, 2006, Lopez worked as an ORS in the Eastshore Center of the North Bay Facility.

Tr. 20:12-25; 125:11-15; 127:18-128:8.  Finally, Lopez worked as an ORS briefly in the Hayward Center

in the Oakland Facility from June 2, 2008, until June 24, 2008, when UPS terminated him.  Tr. 6:22-7:1;

291:21-292:3; Cavil Decl. ¶ 6.

**1.     Lopez Managed, Coached, and Disciplined Drivers, and Supervised Groups
of Drivers Assigned to Service Specific and Consistent Geographical Areas.**

Lopez managed performance by observing his Drivers, correcting poor work behavior, and

conducting training.  Tr. 340:15-341:3; 341:19-22; 360:7-9; 360:15-18.  In fact, Lopez was responsible

for determining training needs, providing ongoing feedback and support, and ensuring the safety of the

operations.  Tr. 323:21-326:7; 461:6-9; 481:6-482:4; 483:18-484:25; Ex. 41.  Lopez evaluated employee

relations and morale, and identified areas of concern before they became bigger problems.  Tr. 485:1-

486:5; Ex. 41.  Lopez also trained new drivers who had to have Lopez's sign-off to gain seniority and

pass probation.  Tr. 285:16-286:13; 287:8-12; 431:15-433:13; 444:13-15.  As with the Hub position,

Lopez followed the progressive steps of discipline, and lower levels of discipline did not require the

involvement of upper management.  Tr. 463:24-465:15.  Lopez also had the authority to make

termination and promotion recommendations, and Lopez's managers gave them significant weight.

Bloom Decl. ¶ 5-6.

**2.     Lopez Identified Problems and Determined Solutions.**

More broadly, Lopez's job as an ORS was to drill down to the root cause of problems and solve

them.  Tr. 200:12-201:4; 201:14-203:2; 482:10-483:14; Exh. 41.  To accomplish this goal, he created

actions plans that laid out certain steps necessary to reach a certain goal.  Tr. 360:7-9; 360:15-361:2;

-8-

UPS'S MEMO. ISO SUMMARY JUDGMENT
U.S.D.C., N.D. Cal., No. C-08-5396-SI

**TABLE OF AUTHORITIES**

**Page(s)**

449:3-15; Ex. 37.  Lopez also worked with others to troubleshoot inefficiencies and modify plans and he reviewed various sources of information to identity opportunities to reduce costs and improve performance.  Tr. 482:10-483:14; Ex. 41.  For example, Lopez addressed "over-alloweds," a problem that occurs when drivers go over the allotted time to make their deliveries, by varying his approach based on his assessment of the situation and its source.  Tr. 200:12-201:4; 201:14-203:2; 203:8-14.  He might conduct informal training, address the issue through the dispatch process, or retrain the driver to correct the problem; and he could take these steps without his manager's permission.  *Id.*  Lopez also worked to distribute work between Drivers by, for example, redistributing volume between package cars in the morning or modifying delivery routes in the afternoon because of daily volume fluctuations.  Tr. 82:4-6; Bloom Decl. ¶ 8-9.  Other problems that Lopez confronted include customer customers, for which he could decide upon the appropriate course of action based on its nature.  Tr. 325:4-326:7.  In addition, Lopez conducted accident investigation to figure out what went wrong and why.  Tr. 395:18-22.

### 3.     Lopez Was Primarily Engaged in Management Duties

Lopez also testified to a plethora of management tasks requiring discretion and independent as ORS, including managing the on-road performance of his Drivers, Tr. 479:10-481:5, Exh. 41; 463:12-23; supervising and developing other employees by, for example, determining employees' training needs, holding employees' accountable, and resolving individual and group performance issues, Tr. 461:6-9; 481:6-482:4, Exh. 41; maintaining operational performance, Tr. 482:10-483:14, Exh. 41; and ensuring health and safety compliance, Tr. 483:18-484:25, Exh. 41.  on.  Tr. 456:23-458:13; 461:6-9; 463:12-23; 479:10-482:4; 482:10-483:14; 483:18-486:5; 486:12-487:16; 487:17-22; Exh. 41.  Lopez spent more than 50% f his time on these and other exempt job duties.  Tr. 140:7-18.  Lopez's Managers confirm that he spent the vast majority of his time on exempt duties.  Bloom Decl. ¶ 10-11.

### G.     For Several Months Lopez Worked as On-Job Supervisor on Special Assignment.

From January 1, 2005 to August 1, 2005, Lopez worked in IE as On-Job Supervisor.  Tr. 23:7-10; Copeman Decl. ¶ 3; Grossman Decl. ¶ 3.  At the time, UPS was implementing a new package dispatching tool called PAS, a part of which was restructuring Drivers' delivery routes to make them more efficient. Copeman Decl.  ¶ 4.  To do so, it assembled a group of On-Road Supervisors who, like Lopez, had never worked in UPS's Industrial Engineering Department.  *Id.* ¶ 12.  Lopez's job as an On-

UPS'S MEMO. ISO SUMMARY JUDGMENT
U.S.D.C., N.D. Cal., No. C-08-5396-SI

1  Job Supervisor was to observe routes ~~and to recommend changes~~, such as combining, splitting, or

2  modifying the routes, to make those routes more efficient and cost-effective.  Tr. 71:16-72:13; 131:6-

3  133:2; 342:22-343:5; Ex. 2.  To prepare for a ride with a driver, Lopez reviewed how the route was

4  driven, how packages were delivered, the driver's history, and service results to prepare him to observe

5  the route.  Tr. 71:2-10; 147:16-148:5; Exh. 2.  During the rides, Lopez evaluated the route and Lopez

6  tested possible alterations by instructing drivers to deviate from the planned route.  Copeman Decl. ¶ 7.

7  Lopez worked alone with the driver and had infrequent contact with the Center or his manager.  Tr.

8  134:24-135:16; 137:14-138:3; 343:6-14.  Lopez also completed his preparation work with little

9  assistance from his manager.  Tr. 134:24-135:16; 137:14-138:3.

10  After completing his preparation and observation, Lopez recommended route alterations.  Tr.

11  71:16-72:13; 131:6-133:2; 342:22-343:5; Exh. 2.  A route can be delivered in several ways, so Lopez

12  used his own judgment to recommend the configuration.  Copeman Decl. ¶ 7.  In some cases, Lopez's

13  managers followed his recommendations.  Tr. 133:3-17.  Other than the tasks associated with this

14  position and delivering or picking-up packages in interstate commerce, Lopez did not perform any other

15  tasks as On-Job Supervisor.  Tr. 140:7-18; *see* Copeman Decl. ¶ 13-15.

16  **H.    As Training and Retention Supervisor, Lopez Managed the Training and Retention
         Program for the Twilight and Night Sorts in the North Bay Facility.**

17

18  Lopez was Training and Retention Supervisor for the Twilight Sort and Night Sort in the North

19  Bay Facility from February 1, 2008, to June 1, 2008.  Tr. 28:6-8; 28:25-29:13.  In this position, Lopez

20  managed the training and evaluation process for new employees and decided whether to sign-off on new

21  employees' training packet, allowing them to remain employed past probation and make seniority, or not

22  to sign-off, resulting in termination.  Tr. 195:24-195:2; 285:23-286:9.  He was also responsible for

23  developing ideas to improve retention and chaired the local committees that worked to reduce turnover

24  and address employee concerns.  Tr. 75:24-76:5; 359:6-10; 433:17-434:21; Ex. 29; 437:6-16.  Lopez also

25  planned his own events once a week to help improve retention.  Tr. 352:21-353:13.

26  Lopez's duties as Training and Retention Supervisor also required him to improve the safety of

27  UPS's operation.  Tr. 359:6-10.  Lopez monitored employees to ensure they remained compliant with the

28  relevant training requirements, and delegated training assignments to his subordinates.  Tr. 354:3-355:9.

TABLE OF AUTHORITIES

Page(s)

1    Lopez also maintained OSHA requirements and related compliance documentation, as well as material

2    for safety audits.  Tr. 66:4-14; 68:4-5; 77:18-78:15, Ex. 2; 149:24-150:7.  In the case of employee injury,

3    Lopez ensured that the employee received medical attention and recommended changes to prevent future

4    injuries.  Tr. 151:7-18; 152:14-24; 153:8-154:5.

5          Lopez accomplished these tasks with minimal supervision from his Hub Managers.  Tr. 352:21-

6    354:2; Joshua Decl. 4.  Lopez supervised his own team of five PTS who worked exclusively for him in

7    the training and retention program.  Tr. 28:25-29:13; 149:17-23; 415:2-10.  He supervised the work of

8    his PTS and met with them daily to provide assignments.  Tr. 151:2-6; 355:10-20.  Lopez also provided

9    his PTS with informal training .  Tr. 288:13-18.  When his PTS did not perform, he could discipline

10   them without manager approval and had authority to recommend their termination.  Tr. 188:11-19;

11   361:9-20.  Lopez performed no hourly work in this position.  Tr. 410:19-23; 412:5-7; 414:5-7.

12          **I.       UPS Compensated Lopez As A Manager.**

13          Lopez earned a monthly salary of at least $4,018.18 as a FTS.  In addition, Lopez qualified for

14   UPS's Management Incentive Program ("MIP"), an annual stock bonus, and a half-month salary bonus.

15   Tr. 451:20-452:12.  These awards are not available to non-exempt hourly employees.  Cavil Decl. ¶ 13,

16   15.  Lopez's annual stock awards have been worth as much as $12,480 in the seven years that he has

17   been eligible, and his half-month bonuses ranged from $2,162.50 to $2,820.  *Id*. ¶ 12, 14.

18   **III.    UPS IS ENTITLED TO SUMMARY JUDGMENT**

19          UPS has two complete defenses to Lopez's claims: the executive and administrative exemptions.

20   A supervisor who is properly classified as an exempt executive or administrative employee is not entitled

21   to extra pay for overtime hours.  *See* Cal. Lab. Code §§ 510, 515; Wage Order 9-2001 § (1)(A)(1), (2).

22   Similarly, employers need not provide meal or rest periods to exempt employees, or furnish wage

23   statements showing hours worked or the relevant hourly pay rates.  Cal. Lab. Code §§ 226(a), 226.7;

24   Wage Order 9-2001 § (1)(A)(1), (2).[2]  Lopez's remaining claims all are premised on his allegedly

25   improper exempt status.  Compl. ¶¶ 33-41 (conversion), 42-45 (waiting time penalties), 46-49 (unfair

26   competition).  Because UPS properly classified Lopez as an exempt executive or administrative

27

28   _____
     [2] Wage Order 9-2001, which regulates wages, hours, and working conditions in the transportation
     industry, is codified at California Code of Regulations title 8, section 11090.

1    employee, all of Lopez's claims fail ~~as a matter of law and summary~~ judgment is proper.  *See* Fed. R.

2    Civ. P. 56.  Further, even if Lopez is found to be non-exempt for some, but not all the positions at issue,

3    UPS is entitled to summary judgment on most of his claims.  *Id.*

**A.    As Hub Supervisor, Preload Supervisor, Training And Retention Supervisor, And ORS, Lopez Was Properly Classified As Exempt Under The Executive Exemption.**

6          The executive exemption applies to supervisors who (a) manage a customarily recognized

7    subdivision of his employer's enterprise, (b) customarily and regularly direct the work of at least two

8    other employees, (c) have the authority to hire or fire another employee, or have his recommendations as

9    to hiring, firing, or other changes in status be accorded particular weight, (d) customarily and regularly

10   exercise discretion and independent judgment, (e) are primarily engaged in exempt job duties, and (f)

11   earn at least two times the California minimum wage.[3]  *See* Wage Order 9-2001 § (1)(A)(1).  Lopez has

12   been an exempt executive employee during all times he worked as Hub Supervisor, Preload Supervisor,

13   Training and Retention Supervisor, and ORS.

**1.    Lopez Managed a Recognized Subdivision and Supervised Many Employees.**

15         The "customarily recognized department or subdivision" requirement is "intended to distinguish

16   between a mere collection of [employees] assigned from time to time to a specific job or series of jobs

17   [on one hand] and a unit with permanent status and function [on the other]."  29 C.F.R. § 541.104

18   (2002).  Any defined unit with a continuing function satisfies this requirement.  For example, numerous

19   courts have held that shifts, "groupings," or "teams" constitute customarily recognized subdivisions.[4]

---

[3] As an exempt employee Lopez never earned less than $2,500 per month, which well exceeded the state minimum wage for all periods of time at issue.  Tr. 452:13-453:17.  *See* Cal. Lab. Code §§ 1182.11, 1182.12.

[4] *See West v. Anne Arundel County*, 137 F.3d 752, 763 (4th Cir. 1998) ("A station or a shift constitutes a recognized department or subdivision of the Fire Department . . . ."); *Joiner v. City of Macon*, 647 F. Supp. 718, 721-22 (M.D. Ga. 1986) (concluding that bus operators with day/night shifts constituted recognized subdivision; they "occupy a permanent and continuous position within the system, rather than providing a temporary function"); *Molina v. Sea Land Servs., Inc.*, 2 F. Supp. 2d 185, 188 (D.P.R. 1998) (concluding that night shift crane operation, in which cranes load and unload freight containers, was a customarily recognized subdivision).  Management in this context is also synonymous with the duties discussed in section III.A.1, above, as to the exercise of discretion and independent judgment.  *E.g.*, *Baldwin v. Trailer Inns Inc.*, 266 F.3d 1104, 1116-17 (9th Cir. 2001) (requirement satisfied where employees are "responsible for training the assistant managers, ensuring their compliance with policies and procedures, and reporting their hours worked every two weeks," as well as "evaluat[ing] the work of assistant managers" and "recommend[ing] firing assistant managers…").

UPS'S MEMO. ISO SUMMARY JUDGMENT
U.S.D.C., N.D. Cal., No. C-08-5396-SI

LEGAL_US_W # 63634475.9

**TABLE OF AUTHORITIES**

**Page(s)**

TABLE OF AUTHORITIES

Page(s)

On the Day Sort and the Twilight Sort as Hub Supervisor, Lopez managed the North Wall and directed the work of the seven PTS and 45-60 subordinate hourly employees assigned to it. Tr. 89:13-23; 90:17-91:3; 94:16-18.  Likewise, when Lopez worked the Night Sort he was responsible for the South Wall and supervised the five PTS and 45-60 subordinate hourly subordinate employees to it.  Tr. 92:14-92:24; 210:12-22.  For each Wall and each Sort, the hourly employees worked in defined groups, consistently organized into belts based on destination, and every belt was supervised by a single PTS who, in turn, reported to Lopez.  Tr. 86:15-87:24; 91:17-20; 95:15-96:1; 96:13-17; Comer Decl. ¶ 9-10.

Similarly, as Training and Retention Supervisor, Lopez had sole responsibility for the Training and Retention Program on the Twilight Sort and Night Sort in the North Bay Hub, and he directly supervised five PTS who were assigned only to him and his functional areas.  Tr. 28:25-29:13; 149:17-23; 415:2-10.

As Preload Supervisor, Lopez had sole responsibility for the entire preload operation in the East Shore Center, was the only direct supervisor for the five PTS who worked in that function, and was the second-level supervisor for the 40 hourly employees who reported to his PTS in the Preload.  Tr. 167:14-18; 167:24-168:7.

Likewise, as ORS, Lopez was responsible for a defined group of Drivers with a continuing function that was delineated by geographic area.  In the Benicia Center, Lopez's 14 to 17 Drivers serviced  specific zip codes that included all of Benicia and a portion of Martinez.  Tr. 124:12-18; 126:13-22.  In Napa, his 10 to 11 Drivers serviced the vineyard areas of Napa Valley.  Tr. 124:4-17; 125:6-10.  And in the East Shore Center, Lopez's approximately 20 Drivers serviced a defined area that consisted of Berkeley except for the University of California campus.  Tr. 125:11-15;127:18-128:8.  For each of Lopez's ORS assignments, he was both the only ORS assigned to his specific geographic areas, and the only ORS who supervised the defined group of Drivers who worked in those areas, as reflected in the reports UPS provided to Lopez.  Tr. 124:12-18; 125:6-15; 374:17-375:23.

Because Sorts, Walls, Package Centers, and Driver groups are defined units recognizable and distinct by name and function with more than two employees who consistently work in them, Lopez's

**TABLE OF AUTHORITIES**

**Page(s)**

1   Hub Supervisor, Preload Supervisor, ~~Training and Retention Super~~visor, and ORS positions satisfy these

2   elements of the executive exemption.

3       **2.      Lopez Had the Authority to Make Personnel Status Changes, and His**
            **Recommendations Were Given Particular Weight.**
4

5       The executive exemption does not require that employees have final authority to make status

6   changes; it is sufficient that recommendations about such matters "will be given particular weight."

7   Wage Order 9-2001 § (1)(A)(1)(c).[5]

8       As Hub Supervisor, Preload Supervisor, Training and Retention Supervisor, and ORS, Lopez had

9   the authority to make personnel status changes, or his recommendations were given particular weight.  In

10  the Hub and Preload, and as Training and Retention Supervisor, Lopez was responsible for evaluating

11  the performance of new hires and then recommending their promotion to seniority status or termination.

12  Tr. 190:23-192:7; 195:24-196:22; 197:2-7; 286:11-286:9; 319:17-321:3; 431:15-433:13.  As ORS, Lopez

13  similarly evaluated new Drivers, and to make seniority Lopez had to sign-off on the Driver's

14  performance.  Tr. 285:16-286:13; 287:8-12; 431:15-433:13; 444:13-15.

15      Lopez also made recommendations that affected personnel status after employees made seniority.

16  For example, as Hub Supervisor, he recommended more than ten employees for termination and directly

17  issued a working discharge to an employee on the Twilight Sort.  Tr. 187:16-19.  Lopez recommended

18  the termination of at least one employee as Preload Supervisor and admitted that he had the authority to

19  recommend the termination of his PTS as Training and Retention Supervisor.  Tr. 188:11-19; 196:19-22;

20  197:2-7; 433:2-4; Exh. 28.  Indeed, UPS trained Lopez in how to hold his subordinates accountable to

21  performance expectations.  Tr. 161:21-162:22.  It was Lopez's job as FTS to lead employees through the

22  chain of discipline when they failed to correct their misperformance, up to and including termination.

23  Tr. 161:8-20; 184:2-185:17; 188:20-189:11; 192:17; 193:12; 361:9-20; 361:9-20; 463:24-465:15.  As

24  ORS Lopez also had the authority to make termination recommendations.  Bloom Decl. ¶ 5.  Lopez

25  played a role in promoting and disciplining employees, too.  A candidate working for Lopez could not

26

27  _____
    [5] *Accord* 29 C.F.R. § 541.106 (2002) (An employee's suggestions and recommendations may still be
    deemed to have "particular weight" even if a higher level manager's recommendation has more
    importance and even if the employee does not have authority to make the ultimate decision as to the
28  employee's change in status).

UPS'S MEMO. ISO SUMMARY JUDGMENT
U.S.D.C., N.D. Cal., No. C-08-5396-SI

LEGAL_US_W # 63634475.9

1  advance to a higher position without ~~Lopez's evaluation and approval~~. Tr. 439:23-443:2; 443:6-444:3;

2  444:16-445:18; 496:3-22; Exhs. 32-34.

**TABLE OF AUTHORITIES**

**Page(s)**

3      Lopez's recommendations regarding personnel status changes, including retention, termination,

4  discipline, and promotion were given particular weight.  Tr. 361:24-362:12; Conyers Decl. ¶ 8-11;

5  Joshua Decl. ¶ 6; Comer Decl. ¶ 14-16; Bloom ¶ 5-7.

6              **3.**    **Lopez Exercised Discretion And Independent Judgment.**

7      To qualify as exempt, Lopez must have exercised discretion and independent judgment more than

8  occasionally, but less than constantly.  *See* 29 C.F.R. § 541.207(a) (2002).[6]  This standard "involves the

9  comparison and the evaluation of possible courses of conduct, and acting or making a decision after the

10 various possibilities have been considered." *Id.*  Discretion and independent judgment must be exercised

11 as to "matters of significance," a phrase which refers "to the level of importance or consequence of the

12 work performed." *Id.*

13             **a.**    **Management Involves Discretion and Independent Judgment.**

14     Duties performed by management employees call for the regular exercise of discretion and

15 independent judgment as to matters of significance.  *See Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104,

16 1115 (9th Cir. 2001) (concluding managers exercised discretion because they had employee oversight

17 and responsibility for implementation of corporate policies).  Lopez is no exception.  His job as FTS

18 required him to identify and solve problems, adapt to changing conditions quickly, and resolve

19 unexpected problems to ensure UPS meets is service commitments.

20     In the Hub and the Preload, Lopez respond quickly and make decisions about where and how to

21 allocate resources to ensure the continued operation of his unit.  He supervised his PTS and hourly

22 employees by walking the floor during the operation, identifying problems, and correcting them.  Tr.

23 269:13-17; 269:21-25; 387:24-388:16.  If employees were not following the correct method or

---

[6] In 2004 the United States Department of Labor issued new regulations defining the scope of the federal exemptions under the Fair Labor Standards Act of 1938.  While the new federal standard differs from California law, the prior federal regulations more closely reflected the California exemptions, and regulatory guidance and case law under the federal regulations are used to interpret similar language at the state level. *Bell v. Farmers Ins. Exch.*, 87 Cal. App. 4th 805, 815 (2001).  Indeed, the Wage Order explicitly incorporates portions of the prior federal regulations.  *See* Wage Order 9-2001 § (1)(A)(1)(e) (executive exemption), (1)(A)(2)(f) (administrative exemption).  The prior federal regulations are included in UPS's appendix of federal authorities.

procedure, Lopez addressed the issue and would decide whether to remedy the problem himself or

delegate it to a PTS.  Tr. 283:8-284:7.  Lopez also moved employees around to deal with arising

problems, like a belt backing up, and he could ask another FTS to dispatch his or her subordinates to

assist.  Tr. 269:13-17; 295:16-296:4; 296:17-297:25; 378:15-20; 388:17-389:2.

As Training and Retention Supervisor, Lopez's job was to increase retention, develop initiatives

to improve safety, monitor employees' compliance with safety and hazardous materials trainings, and

ensure their compliance did not lapse.  Tr. 30:5-10; 75:24-76:5; 149:24-150:7; 355:1-9; 359:6-10.

Lopez's ORS position similarly required discretion and independent judgment.  He varied his

approach based on his assessment of the situation and the problem's route cause, and he might conduct

informal training, address the issue through the dispatch process, or retrain the driver to correct the

problem; and he could take these steps without his manager's permission.  Tr. 200:12-201:4; 201:14-

203:2; 203:8-14.

Lopez's supervisory duties thus require discretion and judgment and fall squarely within the

governing regulation enumerating exempt executive tasks.  *See* 29 C.F.R. § 541.102(b) (2002) (*e.g.*,

exempt activities include training, setting and adjusting hours of work, directing work, appraising

productivity, handling complaints, discipline, planning the work, apportioning the work among workers,

providing for safety).  Indeed, courts have found that these exact types of duties call for the regular

exercise of discretion and independent judgment as to matters of significance.[7]

**b.     UPS's Policies Leave Room for Management.**

Lopez will contend that the constraints of UPS policies rendered him non-exempt.  (Compl. ¶ 8.)

Even managers who are bound by strict corporate standards, however, are exempt.  *See Donovan v.*

---

[7] *E.g.*, *Perine v. ABF Freight Sys., Inc.*, 457 F. Supp. 2d 1004, 1007, 1016 (C.D. Cal. 2006) (finding discretion and independent judgment on important matters because the plaintiff assigned drivers, decided how to handle absences or shortages, monitored hours, performance, and absenteeism, determined discipline, engaged in fact-gathering and ensured completion of accident reports, dealt with customer issues, and provided input on hiring, firing).  *Accord Kennedy v. Commonwealth Edison Co.*, 410 F.3d 365, 375 (7th Cir. 2005) ("One of the primary tasks of the … First Line Supervisors is to assess the members of their team and decide which worker can complete a task most efficiently.  These are matters of consequence that require the exercise of discretion and independent judgment."); *Lott v. Howard Wilson Chrysler-Plymouth, Inc.*, 203 F.3d 326, 332 (5th Cir. 2000) (noting managers exercise "discretion and independent judgment" because they supervised employees, coordinated work, issued discipline, evaluated performance, recommended hiring/firing, and supervised training); *Piscione v. Ernst & Young, LLP*, 171 F.3d 527, 537 (7th Cir. 1999) ("[R]esponsibilities included supervising several employees, which would necessarily require him to exercise discretion and independent judgment").

1 *Burger King Corp.*, 675 F.2d 516, 521-522 (2d Cir. 1982).  Indeed, "The fact that [UPS] has well-

2 defined policies, and that tasks are spelled out in great detail, is insufficient to negate this conclusion.

3 Ensuring that company policies are carried out constitutes the 'very essence of supervisory work.'"  *See*

4 *Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982) (internal quotation omitted).  In any

5 event, Lopez testified that UPS's policies and procedures applied only to his subordinates, and Lopez is

6 unaware of any policies or procedures that governed the performance of his job as FTS.  Tr. 206:5-14.

7 Instead, UPS trained him to make decisions.  Tr. 282:20-23.

8     **4.     Lopez Was Primarily Engaged in Exempt Duties.**

9     Managing subordinates, directing their work, and monitoring their performance and the

10 performance of the business are all exempt duties.  29 C.F.R. §§ 541.102(b), 541.108 (2002).  Further,

11 exempt work includes "all work that is directly and closely related to exempt work and work which is

12 properly viewed as a means for carrying out exempt functions."  Wage Order 9-2001 § 1(A)(1)(e).

13 Lopez spent the majority of his time engaged in exempt job duties.  As both Preload Supervisor and

14 Training and Retention Supervisor, Lopez performed *no* hourly work.  Tr. 410:19-23; 412:5-7; 414:5-7.

15 Lopez spent 80% of his time as Hub Supervisor on exempt tasks.  Tr. 102:12-105:6; Exh. 3.  Similarly,

16 Lopez only testified to performing tasks that required discretion and independent as ORS, as discussed in

17 section II.F, above, and Lopez spent more than 50% of his time on these and other exempt job duties.

18 Tr. 140:7-18; Bloom Decl. ¶ 10-11.  Accordingly, Lopez was properly classified as exempt while

19 working as Hub Supervisor, Preload Supervisor, Training and Retention Supervisor, and ORS.

20     **B.     Lopez Was Also Exempt Under The Administrative Exemption As Hub Supervisor,**
       **Preload Supervisor, Training And Retention Supervisor, and ORS.**
21

22     To be exempt as an administrative employee Lopez must have: (1) performed office work

23 directly related to the management policies or general business operations of UPS; (2) customarily and

24 regularly exercised discretion and independent judgment; (3) either (a) assisted a *bona fide* executive or

---

25 [8] *Accord McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003) ("Just
because McAllister was required to follow detailed manuals does not mean she did not exercise
26 discretion and independent judgment."); *Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 14 (1st Cir. 1997)
(concluding that sales representatives exercised discretion and independent judgment in applying
27 techniques to particular clients); *Roe-Midgett v. CC Servs., Inc.*, 512 F.3d 865 (7th Cir. 2008) (finding
claims adjusters exercised discretion and independent judgment even though they were required to use
28 adjusting manuals and estimating software).

UPS'S MEMO. ISO SUMMARY JUDGMENT
U.S.D.C., N.D. Cal., No. C-08-5396-SI

**TABLE OF AUTHORITIES**

**Page(s)**

1  administrative employee, *or* (b) performed work requiring specialized experience or knowledge under

2  only general supervision, *or* (c) executed special assignments and tasks under only general supervision;

3  (4) been primarily engaged in exempt duties; and (5) earned at least twice the minimum wage.  *See* Wage

4  Order 9-2001 § 1(A)(2).  As discussed above with regard to the executive exemption, Lopez satisfies the

5  second, fourth, and fifth elements.  He also satisfies he first and third based on his own testimony.

**1.  Lopez's Work Related to Management Policies and Business Operations.**

7  The administrative exemption distinguishes between production employees who are engaged in

8  producing the good or service that is the employer's business and employees who administer the

9  business, manage business operations, and implement company policy.  *See Bell*, 87 Cal. App. 4th at 820

10  (2001) (noting the dichotomy between administrative workers, who manage business operations, and

11  production workers, who produce the "commodity" that the enterprise exists to produce).  Only the latter

12  are exempt.  *See* 29 C.F.R. § 541.205(a) (2002).

13  As discussed above, Lopez testified that his job was to supervise the operation and subordinate

14  employees rather than perform the hourly work himself.  For example, Lopez trained, coached, and

15  disciplined PTS and hourly employees.  And Lopez spent the majority of his time supervising his

16  employees and managing the operation.  These are all duties that qualify for the exemption because they

17  are "types of activities relating to the administrative operations of a business as distinguished from

18  'production' or, . . ., 'sales' work."  *See* C.F.R. § 541.205(a) (2002).  Indeed, management involves

19  implementation of policies and thus falls under the administrative exemption.  *See Howard Wilson*

20  *Chrysler-Plymouth, Inc.*, 203 F.3d at 331-32.

**2.  Lopez Meets the Third Element of the Administrative Exemption.**

22  UPS need establish only one aspect of the third element of the administrative exemption.  Here,

23  UPS can establish two of the three aspects.

24  The second aspect requires Lopez to "perform[] under only general supervision work along

25  specialized or technical lines, requiring special training, experience, or knowledge."  This element exists

26  when the employee relies upon his experience and knowledge to make highly technical decisions on a

27  daily basis.  *Perine v. ABF Freight Sys., Inc.*, 457 F. Supp. 2d 1004, 1011-12 (C.D. Cal. 2006) (finding

28

element satisfied by decisions related to driver dispatch). Lopez's positions required him to have special training. Tr. 161:21-162:22; 292:22-294:5; Exh. 19.

The third aspect requires that Lopez "[e]xecutes under only general supervision special assignments and tasks." This element exists when the employee "carr[ies] out . . . multiple and complex duties with only general supervision from [his supervisor]." *Anderson v. City of Cleveland*, 90 F. Supp. 2d 906, 909-10, 913-14 (E.D. Tenn. 2000). Lopez thus qualifies for the administrative exemption because his jobs required him to carry out multiple and complex duties independently, without supervision, as discussed in sections II and III.A, above.

**C.     Lopez Was Exempt Under The Administrative Exemption As On-Job Supervisor.**

> **1.     Lopez Performed Work Related to General Business Operations and His Job Required the Exercise of Discretion and Independent Judgment.**

Lopez's job as an On-Job Supervisor was to observe routes and recommend changes that made those routes more efficient and cost-effective. Tr. 71:16-72:13; 131:6-133:2; 342:22-343:5; Exh. 2. His job required him to exercise discretion and independent judgment because each route could be delivered in many possible ways, and Lopez's recommendations about how to modify the routes were based on the observations he conducted by himself, his own independent review of how the driver performed on the route, and his ideas about improving efficiency and cost-effectiveness. Copeman Decl. ¶ 7-11. These recommendations were considered and in some cases followed. Tr. 133:3-17. These job duties qualify Lopez for the administrative exemption because his task was to improve operational performance rather than to engage in operational production to make decisions about how to improve routes, even if he did not have final authority to implement those decisions. *See* 29 C.F.R. §§ 541.205(a) (distinguishing administrative and production work), 541.207(e) (stating that discretion and independent judgment "does not necessarily imply that the decisions made by the employee must have a finality that goes with unlimited authority and a complete absence of review."); *Anderson*, 90 F. Supp. 2d 906 at 913; *Bell*, 87 Cal. App. 4th at 82.

> **2.     Lopez Executed Special Tasks Under General Supervision**

Lopez was responsible for making significant changes to UPS's driver-routes, including combining or splitting routes, to create new delivery pathways. Copeman ¶ 7, 9. By the very nature of

UPS'S MEMO. ISO SUMMARY JUDGMENT
U.S.D.C., N.D. Cal., No. C-08-5396-SI

his position, Lopez worked with little supervision.  He spent two to three days per week on-road with

drivers, and during this time, Lopez was alone with the driver and had infrequent contact with the

Center.  Tr. 134:24-135:16; 137:14-138:3; 343:6-14.  While preparing for rides in the Center on one or

two days per week, Lopez reviewed reports and driver performance without assistance from his

Manager.  Tr. 134:24-135:16; 137:14-138:3; Copeman Decl. ¶ 10-11.

### 3.  Lopez Was Primarily Engaged in Exempt Duties.

Other than delivering and picking-up packages in interstate commerce using qualifying vehicles

under the Motor Carrier Act, as discussed in the next section, Lopez's only tasks were observing routes

on-car to make recommendations about changes or preparing for his rides in the office.  Tr. 147:12-22;

148:6-148:8; *see* Copeman Decl. ¶ 13-15.  He therefore spent more than 50% of his time on exempt

activities, or activities directly and closely related to exempt activities.  *See* Wage Order 9-2001 §

1(A)(2)(f); 29 C.F.R. § 541.207(a) (2002).

Because Lopez was an exempt executive or administrative employee at all times, UPS is entitled

to summary judgment.

## IV.  THE MOTOR CARRIER ACT BARS LOPEZ'S OVERTIME CLAIMS

Independently, UPS is entitled to partial summary judgment because Lopez was properly exempt

under the federal Motor Carrier Act during the times he worked as an ORS.  California law exempts

employees whose hours of service are regulated by the U.S. Department of Transportation's  under the

federal Motor Carrier Act from the state's overtime pay requirement.  Wage Order 9-2001 § 3(L)(1).

Lopez's hours of service were regulated by the DOT, because: (1) UPS is a motor carrier; (2) Lopez

drove qualifying vehicles to deliver or pick up packages more than a *de minimis* amount of time, or UPS

reasonably expected him to do so;[9] and (3) the packages flowed in interstate commerce.  49 C.F.R.

§§ 395.1-395.13.

### A.  UPS Is A Motor Carrier.

The DOT has the authority to regulate "a motor carrier."  49 U.S.C. § 31502(b)(1).  A motor

carrier is "a person providing motor vehicle transportation for compensation."  49 U.S.C. § 13102(14).

UPS is licensed by the DOT as a motor carrier.  Britt Decl. ¶¶ 8-9.

---

[9] Qualifying vehicles are those weighing at least 10,001 pounds.  49 U.S.C. § 31132(1)(A).

UPS'S MEMO. ISO SUMMARY JUDGMENT
U.S.D.C., N.D. Cal., No. C-08-5396-SI

**TABLE OF AUTHORITIES**

**Page(s)**

**B.**     **Lopez's Driving Activity Qualifies Him For The Exemption.**

The DOT regulates "classes of employees" who "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of . . . property in interstate . . . commerce." 29 C.F.R. § 782.2(a).  "[O]ne who drives a vehicle in interstate commerce directly affects the safety of such operations as long as he is driving." *Crooker v. Sexton Motors, Inc.*, 469 F.2d 206, 209 (1st Cir. 1972).[10]

Indeed, "if the bona fide duties of the job performed by the employee are in fact such that he is . . . called upon in the ordinary course of his work to perform, either regularly *or from time to time*, safety-affecting activities . . . , he comes within the exemption *in all workweeks* when he is employed at such job." 29 C.F.R. § 782.2(b)(3) (emphasis added).  This rule "applies regardless of the proportion of the employee's time or of his activities . . . devoted to such safety-affecting work in the particular workweek, and the exemption will be applicable even in a workweek when the employee happens to perform no work directly affecting 'safety of operation.'" *Id.*  Moreover, it is the DOT's position that it has jurisdiction over a driver who is "*subject to being called on*, to drive in interstate commerce as part of the driver's regular employment . . . . *even if the driver has not personally driven in interstate commerce* if, . . ., the driver could *reasonably be expected* to do interstate driving." 46 Fed. Reg. 37902, 37903 (1981) (emphasis added).[11]  Thus, the MCA applies even where driving activity is very minimal.

Lopez qualified for the MCA from May 13, 2004, to December 31, 2005.  Lopez testified that he drove to deliver or pick up packages at least twice per month as an ORS during this time period, that the packages he handled were flowing across state lines, and that he drove qualifying UPS vehicles.  *See* Tr.

---

[10] DOT regulations apply unless the employee's activities have only a *de minimis* effect on safety. *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 707-8 (1947).  But *de minimis* activities are only those that "have no substantial direct effect" on safety of operations, or are "trivial, casual or insignificant." 29 C.F.R. § 782.2(b)(3); *see also Pyramid Motor*, 330 U.S. at 707-08.  "[H]owever frequently or infrequently," driving "directly affect[s] the safety of motor vehicle operations." *Crooker*, 469 F.2d at 210.  The "*de minimis* rule should seldom, if ever, be applied to one who drives a motor vehicle carrying property of a private carrier in interstate commerce." *Hutson v. Rent-A-Center, Inc.*, 209 F. Supp. 2d 1353, 1357 (M.D. Ga. 2001) (citations omitted); s*ee also* 46 Fed. Reg. at 37903 (same). Indeed, courts have only applied a *de minimis* exception "when the interstate-travel portion of the employees' work can be characterized as 'infinitesimal,' or "less than one percent." *Anderson v. Timber Prods. Inspection, Inc.*, 334 F. Supp. 2d 1258, 1262-63 (D. Or. 2004) ( "[I]t is not determinative that plaintiffs here spent more time inspecting lumber than transporting property from state to state.").
[11]  *See also Reich v. Am. Driver Serv.*, 33 F.3d 1153, 1156 (9th Cir. 1994) (citing DOT's ruling); *Bishop v. Petro-Chemical Transp., LLC*, 582 F. Supp. 2d 1290, 1301 (E.D. Cal. 2008) ("[T]he real issue [is] whether Plaintiffs could reasonably be expected to travel interstate as part of their duties.").

TABLE OF AUTHORITIES

Page(s)

141:9-142:19; 142:25-143:6; 144:2-14; 145:1-6; 145:22-146:12; Britt Decl. ¶ 6.  UPS's data corroborate Lopez's testimony, indicating that he delivered packages as both an ORS and OJS.  From May 13, 2004, to December 31, 2005, UPS's records show that Lopez had qualified driving in seven percent of workweeks.  Strombom Decl. ¶ 10, Exh. 2. Britt Decl. ¶ 6; Zaleski Decl. ¶ 5, Exh. A.

Because Lopez's actual and reasonably expected driving activity was more than *de minimis*, Lopez "comes within the exemption in all workweeks" from May 13, 2004, to December 31, 2005.

### C.    Lopez Delivered Packages in Interstate Commerce.

Lopez also drove in interstate commerce.  An employee transports goods in interstate commerce when he or she drives within "a single State" and "is a part of an interstate movement *of the goods* or persons being thus transported." 29 C.F.R. § 782.7(b)(1) (emphasis added); *Watkins v. Ameripride Servs.*, 375 F.3d 821, 825-26 (9th Cir. 2004).  Lopez testified that he knew the packages he was handling were moving in interstate commerce.  Tr. 145:22-146:12; *accord* Hill Decl. ¶ 6-7.

For these reasons, Lopez qualifies for the MCA exemption and his overtime claim is barred during times he was an ORS and On-Job Supervisor.

### V.    UPS IS ENTITLED TO PREVAIL ON LOPEZ'S REMAINING CLAIMS FOR SEPARATE AND INDEPENDENT REASONS EVEN IF THE COURT FINDS A TRIABLE ISSUE ON EXEMPTION

Alternative, UPS is entitled to partial summary judgment on Lopez's remaining claims because they are each separately barred as a matter of law.

### A.    Lopez Cannot Show He Was Denied Meal And Rest Periods.

Lopez cannot meet his burden to show that UPS failed to provide him with meal and rest periods for two reasons.[12]  First, Lopez was properly classified as exempt for the reasons set forth above, and UPS is not obligated to provide exempt employees with meal or rest periods.  *See* Wage Order 9-2001 § 1(A).  Second, Lopez was aware that UPS provided meal and rest periods, had the opportunity to take breaks, and to the extent he delayed or skipped a meal or rest period, Lopez elected to do so based on *his* subjective assessment of the business situation or his own desires.  Tr. 105:10-106:11; 249:3-6; 251:16-252:17; 253:25-254:17; 255:13-256:4; 259:21-260:14; 261:18-23; 262:14-20; 264:9-265:7; 265:20-24;

---

[12] Additionally, California Labor Code section 226.7 came into effect on January 1, 2001.  *See* 2000 Cal. Stat. ch. 876, § 7.  Thus, Lopez cannot recover any premiums for alleged violations before that date.

1   268:1-269:12; Exh. 4.  No manager ever told Lopez that he could not take his meal or rest periods.  Tr.

2   249:18-250:8.  Further, Lopez never suffered discipline for taking statutory breaks.  Tr. 265:8-19.  UPS

3   cannot be held liable for Lopez's voluntary decision not take a meal or rest period.  *See White v.*

4   *Starbucks Corp.*, 497 F. Supp. 2d 1080, 1086 (N.D. Cal. 2007) (finding statutory obligation is to make

5   statutory breaks available; rejecting liability for voluntarily failure to take meal and rest periods).

**B.      Lopez's Wage Statement Penalty Claim Is Barred.**

7          Lopez's claim for wage statement penalties is also barred because Lopez was properly classified

8   as exempt.  *See* Cal. Lab. Code § 226(a) (excluding exempt employees from relevant itemization

9   requirements).  But even if the claim were not barred, Lopez must show that he has suffered "injury as a

10  result of a knowing and intentional failure by an employer" to recover under section 226(a).  Cal. Lab.

11  Code § 226(e).  UPS did not knowingly and intentionally fail to furnish properly itemized wage

12  statements because it, in good faith, believes that Lopez was properly classified for the reasons it states

13  above.  Accordingly, Lopez's third cause of action is barred.

**C.      Lopez Cannot Recover Waiting Time Penalties Because There Is a Good Faith
         Dispute Regarding Wages Allegedly Due to Him.**

16         California law imposes a penalty of one day's pay for every day, up to 30, that "an employer

17  willfully fails to pay" the final wages of a terminated employee.  Cal. Lab. Code § 203.  A good-faith

18  dispute, based in either law or fact, regarding the wages allegedly due defeats the requisite showing of

19  willfulness and no penalties are available, even if the employer is ultimately found liable for unpaid

20  wages.  *See* 8 Cal. Code Regs. § 13520.[13]  Even if Lopez succeeds in showing that he was improperly

21  classified as exempt, and on that basis is owed wages for overtime work and meal and rest periods, UPS

22  has a good-faith belief that Lopez was properly classified for the reasons discussed above.

**D.      Lopez's Wage Claims Cannot Be Pled as Conversion.**

24         Lopez cannot state his wage claims as conversion for two independent reasons.  First, the Labor

25  Code provides his exclusive remedy for the recovery of wages.  *See Ross v. U.S. Bank, N.A.*, 542 F.

---

[13] *Accord Barnhill v. Robert Saunders & Co.*, 125 Cal. App. 3d 1, 8-9 (1981) (refusing penalties even
though employer's deductions from final paycheck were unlawful because good-faith belief of legality);
*Davis v. Morris*, 37 Cal. App. 2d 269, 274 (1940) (awarding waiting-time penalties because defendant
lacked good-faith belief that defendant was partner rather than employee).

**TABLE OF AUTHORITIES**

**Page(s)**

1    Supp. 2d 1014, 1023-24 (N.D. Cal. 2008) (Illston, J.) ("This Court agrees . . . that the California Labor

2    Code is adequate in providing [Lopez] appropriate remedy for this type of conduct, and the conversion

3    claim is therefore not necessary."). Second, conversion will not support a claim for money unless a

4    specific, identifiable sum is involved. *See McKell v Wash. Mut., Inc.*, 142 Cal. App. 4th 1457, 1491

5    (2006) ("Money cannot be the subject of a cause of action for conversion unless there is a specific,

6    identifiable sum involved ...."). There is no dispute that Lopez's conversion cause of action is based on

7    alleged violations of the California Labor Code and seeks recovery for an unspecified sum of due wages.

8    *See* Compl. ¶¶ 34-35 ("At all relevant times herein, Defendants and continued to have a legal obligation

9    imposed by statute to pay to Lopez all overtime wages and other compensation due."). His conversion

10   claim is, for these reasons, barred.

11                    **E.    Lopez Cannot Recover Civil Penalties.**

12           The California Labor Code Private Attorneys General Act ("PAGA"), Cal. Lab. Code § 2698 *et*

13   *seq.*, requires aggrieved employees to exhaust the statute's administrative procedures before the Labor

14   and Workforce Development Agency ("LWDA") prior to bringing a private action for civil penalties.

15   Cal. Lab. Code § 2699.3; *Arias v. Superior Court*, 46 Cal. 4th 969, 981 (2009) ("Before bringing a civil

16   action . . . for penalties, an employee must comply with Labor Code section 2699.3."). Lopez seeks to

17   recover civil penalties under California Labor Code section 225.5, 226.3, 558, and 1174. Compl. ¶¶ 28-

18   32; Prayer for Relief ¶ 8. This relief is barred as a matter of law because, as he admitted, Lopez did not

19   exhaust the mandatory statutory prerequisites. *See* Sharma Decl. ¶ 3, Exh. B (Lopez's response to

20   UPS's First Request for Admission). *Caliber Bodyworks, Inc. v. Superior Court*, 134 Cal. App. 4th 365,

21   370, 382-83 (2005) (requiring exhaustion before proceeding on civil penalty claim). UPS is therefore

22   entitled to partial summary judgment on Lopez's civil penalty claims.

23                    **F.    Punitive Damages Are Unavailable On Wage Claims.**

24           Lopez cannot recover punitive damages based on his wage-and-hour allegations for two reasons:

25   an action for wages arises out of the unilateral contract of employment, and thus cannot form the basis of

26   any punitive damage award; and the statutory remedies for violation of the compensation provisions of

27   the California Labor Code, including Lopez's allegations here, are exclusive. *See Brewer v. Premier*

28

1   *Golf Props.*, 168 Cal. App. 4th 1243, 1252-54, 1256 (2008).  Further, Lopez cannot recover punitive

2   damages on his conversion claim because it, too, is barred as explained in section V.D, above.

3   **G.      Lopez Cannot State His Claims Under Section 17200.**

4           Lopez seeks to recover as restitution the amounts allegedly due to him as overtime wages and

5   meal and rest period premiums.  Compl. ¶¶ 46-49.  This relief is barred.  First, Lopez's claim under

6   section 17200 of the California Business and Professions Code is based on his alleged misclassification,

7   and UPS is entitled to judgment on this cause of action for the reasons discussed above.  Second, the

8   statute permits restitution only of a vested sum that is quantifiable.  Cal. Bus. & Prof. Code § 17203;

9   *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1150-51 (2003) ("Unlike *Cortez*, then,

10  the monetary relief requested by [the plaintiff] does not represent a quantifiable sum owed by defendants

11  to plaintiff.").  Further, equitable recovery under section 17200 extends only to earned wages.  *Cortez v.*

12  *Purolator Air Filtration Prods. Co.*, 23 Cal. 4th 163, 168 (2000) ("*Once earned*, those unpaid wages

13  became property to which the employees were entitled.") (emphasis added).  Here, Lopez neither

14  quantifies the specific unpaid overtime wages or meal and rest period premiums that he claims, nor

15  provides any method to calculate with certainty due the sums allegedly due.  In addition, meal and rest

16  period premiums are not *earned* wages or quantifiable, and on that basis are not restitutionary under

17  *Korea Supply*.  *See Murphy v. Kenneth Cole Prods., Inc.*, 40 Cal. 4th 1094, 1104, 1111 (2007)

18  (describing nature of meal and rest period premium).

19  **VI.     CONCLUSION**

20          For the foregoing reasons, UPS respectfully requests that the Court grant its motion for summary

21  judgment, or in the alternative, partial summary judgment.

22  DATED:  January 22, 2010.            PAUL, HASTINGS, JANOFSKY & WALKER LLP
                                          E. JEFFREY GRUBE
23                                        RISHI N. SHARMA
                                          RYAN C. HESS
24

25

26                                        By:_____/s/_____
                                                      Rishi N. Sharma
27                                                 Attorneys for Defendant
                                               UNITED PARCEL SERVICE, INC.
28

UPS'S MEMO. ISO SUMMARY JUDGMENT
U.S.D.C., N.D. Cal., No. C-08-5396-SI